**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON**

**CIVIL ACTION NO. 2:18-cv-75 (WOB-CJS)**

**LISA MEIMAN**                                                                        **PLAINTIFF**

**VS.**                  **<u>MEMORANDUM OPINION AND ORDER</u>**

**AETNA LIFE INS. CO.**                                        **DEFENDANT**

Plaintiff, Lisa Meiman, filed suit against Defendant, Aetna Life Insurance, under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*, after Aetna terminated the long-term disability benefits it had been paying her for over ten years. Meiman seeks to recover the denied benefits, plus prejudgment interest, and asks the Court to clarify her rights to future benefits. (Doc. 1, ¶¶ 5, 30).

This matter is now before the Court on Plaintiff's Motion for Judgment on the Administrative Record. (Doc. 45). Deciding that Motion requires the Court to determine whether Aetna correctly found that Meiman could perform a "reasonable occupation" as defined by the terms of the Disability Plan. Considering the medical evidence's consensus that she can perform sedentary work with minor accommodations and a 2016 transferable skills analysis that provides examples of sedentary occupations that meet the Plan's wage requirements, the Court concludes that Aetna was

correct in denying benefits and finds that Plaintiff's Motion should be **DENIED**.

I. <u>**Factual and Procedural Background**</u>

Lisa Meiman, now fifty-four years old, was employed with Delta Airlines for around fifteen years until multiple knee injuries forced her to take long-term disability. (AR 607, 703, 740, 1674). Meiman first injured her right knee in 2003 and underwent a partial medial meniscectomy soon after the injury and an osteochondral autograft transfer procedure in March 2005. (AR 670, 718, 731-32, 848, 970, 1002). Meiman then injured her left knee in late-November 2005 while assisting a customer in a wheelchair. (AR 731-32). After her left-knee injury, a doctor restricted Meiman to sedentary work activity. (AR 629-31). Aetna approved Meiman's initial disability claim in June 2006 when it found that she could not perform the demands of her "own occupation" as a ticket agent (medium work). (AR 349).

Ongoing treatment for those knee injuries led Aetna to conclude on multiple occasions between December 2006 and October 2016 that Meiman could not perform "any reasonable occupation" as defined by the terms of the Plan. In March 2006, orthopedic surgeon Dr. Angelo J. Colosimo diagnosed joint space narrowing, otherwise known as osteoarthritis, in Meiman's right knee. (AR 859). About a year later, Meiman had a third surgery on her right knee. (AR 732, 1002). In a September 2007 follow-up visit, Dr. Colosimo noted

2

that Meiman would remain restricted to working four to six hours per day until she had a left-knee arthroscopy as her left knee was also showing signs of osteoarthritis. (AR 848).

Shortly after the September follow up, Aetna conducted its first transferable skills analysis to find examples of sedentary jobs that Meiman could perform that also paid a wage greater than sixty percent of Meiman's adjusted pre-disability earnings. (AR 1628-30).[1] While the transferable skills analysis identified potential jobs, a subsequent labor market survey indicated that the available jobs failed to meet the Plan's wage requirement. (AR 1622). As such, Aetna again found Meiman disabled. (*Id.*).

Dr. Colosimo continued to deem Meiman disabled, but in late-September 2007 and October 2007, she saw two doctors who both found that she could perform light work. (AR 718-27, 731-35). Accordingly, Aetna conducted a second transferable skills analysis in February 2008 to identify potential jobs. (AR 1613-17). Aetna identified one such example occupation. (AR 1613, 1615-16). But a subsequent labor market survey concluded that the potentially

---

1 Adjusted Predisability Earnings are defined as: "[P]redisability earnings plus any increase made on each January 1, starting on the January 1 following 12 months of a certified period of disability. The increase on each such January 1 will be by the percentage increase in the Consumer Price Index, rounded to the nearest tenth; but not by more than 10%." (AR. 45). Essentially, under the terms of the Plan, Meiman must be able to work a job with a pay rate of at least 60% of what she was making at the time she took disability and that required pay rate increases based on the above terms.

available positions did not meet the Plan's wage requirements, so Aetna again found Meiman disabled. (*Id.*).

Meiman underwent the left-knee arthroscopy procedure in November 2008. (AR 806-07). And in November 2009, Dr. Colosimo indicated that Meiman could perform most of the physical requirements of sedentary work for up to six hours per day. (AR 592). An administrative law judge for the Social Security Administration felt differently and in April 2013 found that Meiman could perform full-time sedentary work with a few additional restrictions. (AR 1501-11). In July 2013, Dr. Colosimo noted that Meiman had received injections in her knees due to reported swelling, pain, and weakness, but he also noted that her radiographs "did not look horrible." (AR 1470, 1522-23). While he found that Meiman could perform the physical requirements of sedentary work, he without explanation concluded that she was still disabled. (*Id.*). Shortly after this visit, an internal nurse reviewer for Aetna reviewed the records and determined that Meiman could work full time. (AR 305).

As a consequence, Aetna conducted a third transferable skills analysis in February 2014 to identify potential occupations. (AR 132-35, 1430-32). The analysis identified four sample occupations that Meiman could possibly perform that also met the Plan's wage criteria. (AR 1431). The sample occupations were, however, considered only fair or potential matches for Meiman. (*Id.*). Aetna

therefore continued to pay disability benefits and did not conduct a labor market survey as it had done in the past. (*Id.*).

In October 2015, a new claim representative took over Meiman's claim. The new representative contacted Meiman, and while he noted that Aetna had not yet identified alternative gainful occupations she could perform, he discussed a more favorable July 2015 attending physician statement from Dr. Colosimo with her. (AR 68). That attending physician statement found that Meiman could perform the physical requirements of sedentary work with some additional restrictions, but again, and without explanation, insisted that she was permanently disabled. (AR 68, 1022-23).

Dr. Colosimo's practice of issuing cursory disabling opinions continued, and in a capabilities and limitations worksheet from January 2016, he once again indicated without explanation that Meiman could perform the physical requirements of sedentary work for only six hours per day. (AR 1305). An internal nurse reviewer for Aetna who examined the worksheet felt that there was no medical evidence suggesting that Meiman could not work a full eight hours. (AR 166). In March 2016, Meiman's claim representative contacted her and informed her that Aetna was unsure as to why Dr. Colosimo had limited her to only six hours of work and explained to her that if Aetna could determine that she could work eight hours and identify gainful employment, then she would no longer be eligible for benefits. (AR 66). During this conversation, Meiman revealed

5

that she could lift items like a gallon of milk and that she helped with her kids, cooked dinner, and that she had been asked by her town's mayor to serve on the city board for code adjustment appeals. (*Id.*).

Shortly after this conversation, Aetna conducted two rounds of surveillance on Meiman. Surveillance from April 19 through April 21, 2016, revealed that Meiman neither moved in a guarded manner nor used any visible assistive devices. (AR 1221-22). She was seen walking up and down the stairs of her deck, walking her dog, walking around her backyard, and watering her plants using a hose. (*Id.*). Meiman was also seen bending to pick up items from the ground, wheeling the garbage bin to the end of the driveway, and driving to pick-up takeout food. (*Id.*). The second round of surveillance from June 6, 8, and 9, 2016, showed Meiman driving, walking to her mailbox, sitting on her front porch steps, and walking with her child to a nearby elementary school. (AR 1212-13).

Soon after the surveillance, in July 2016, Meiman underwent an independent medical examination with Dr. V. James Sammarco, a board-certified orthopedic surgeon. (AR 1205-1210). Dr. Sammarco found that her knee arthritis was the only ailment affecting her ability to work. (*Id.*). After reviewing the surveillance video, Dr. Sammarco stated that Meiman's reported symptoms were in "stark contrast" to what she was seen doing in the video. (AR 1208-09).

6

Dr. Sammarco concluded that Meiman could perform the physical requirements of medium work and could work a full eight-hour day. (AR 1208-10). Aetna then commissioned a fourth transferable skills analysis based on Dr. Sammarco's findings. (AR 1202-03). This 2016 analysis identified five potential occupations that Meiman could perform that also met the adjusted wage requirements. (*Id.*). Three of the example occupations were sedentary, one was light, and one was medium. (*Id.*). The three sedentary occupations were all clerical jobs that would require Meiman to perform record keeping and customer-service-related tasks. (*Id.*). Aetna did not conduct a labor market survey.

Having determined that Meiman could perform a "reasonable occupation," Aetna terminated Meiman's benefits in October 2016. (AR 349-51). Meiman appealed the termination decision and submitted a vocational assessment, a functional capacity evaluation, and additional medical records from Dr. Colosimo's office in support of her appeal. (AR 895-97). While these three pieces of evidence weaken Dr. Sammarco's finding that Meiman could perform medium work, all three of them concede that she can perform full-time sedentary work.

First, though Dr. Colosimo disagreed with Dr. Sammarco's opinion based on x-rays that showed moderate to severe joint space narrowing in Meiman's knees, he had already found that she could perform eight hours of sedentary work with minor accommodations.

7

(*Compare* AR 469-71, *with* AR 1015-16). Second, though Meiman's functional capacity evaluation noted a reduced range of motion and reduced hip and knee strength, it too conceded that she can perform eight hours of sedentary work. (AR 970). Finally, Meiman's vocational assessment identifies potential occupations that are sedentary in nature. (AR 1032-33).

Meiman's vocational assessment provides a useful summary of her career. (*Id.*). The summary states that she spent eleven years working for Disney in operations and training where she taught employees how to operate attractions. (*Id.*). Meiman also worked with Delta as a gate agent, ticket agent, baggage handler, and reservation scheduler for around fifteen years. (*Id.*). She spent six of her years with Delta doing customer service training where she taught classes in customer service and baggage handling. (*Id.*). Meiman's vocational assessment, nevertheless, proceeds to attack Aetna's 2016 transferable skills analysis by insisting that there are no available jobs similar to the positions identified in Aetna's 2016 analysis. (AR 1034-36). It also opines that Meiman is only qualified for entry-level jobs that pay between $10 and $12 per hour due to her long absence from the workforce. (*Id.*).

Aetna also gathered new evidence throughout the appeals process in the form of an independent review of the medical records and a response to the review from Dr. Colosimo. (AR 498-505). Dr. Priya Swamy, who is board certified in pain medicine and physical

medicine and rehabilitation, conducted the independent medical review. (*Id.*). The review dismissed many of the restrictions found in earlier opinions and determined that the only restriction the record supported was limiting Meiman's walking to thirty minutes per hour for four hours a day. (AR 503-04). Although Dr. Colosimo's response letter noted moderate to severe osteoarthritis, he concluded that Meiman could return to a sedentary position so long as she could take short breaks to stretch and did not have to stand for more than one to two hours with a break every thirty minutes or walk for prolonged periods. (AR 462-66).

Aetna upheld its decision to deny benefits after reviewing Meiman's three pieces of evidence, Dr Swamy's independent review, and Dr. Colosimo's response. (AR 403-404). Aetna did, however, retract its initial conclusion that Meiman could perform medium work and on appeal concluded only that she could perform full-time sedentary work. (*Id.*). Relying on its 2016 transferable skills analysis, it found that there were viable sedentary occupations available that also paid an average wage in excess of the Plan's adjusted wage requirement. (*Id.*).

## II. <u>Standard of Review and Analysis</u>

### a. The Court Reviews This Matter *De Novo*

A challenge to an ERISA plan's denial of benefits is "reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine

eligibility for benefits or to construe the terms of the plan." *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Bos.*, 419 F.3d 501, 505-06 (6th Cir. 2005) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Most ERISA plans, like the one here, contain an explicit grant of discretionary authority (AR 29), thereby triggering "the highly deferential arbitrary and capricious standard of review." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006) (internal quotation marks and citation omitted). This case is, however, unique. Despite that the Plan grants Aetna discretionary authority, Aetna has stipulated to the Court conducting a *de novo* review of its decision. (Doc. 21); *cf.* (Doc. 45 at 18; Doc. 47 at 19). Thus, the Court reviews Aetna's benefits determination *de novo*.

When applying a *de novo* standard in the ERISA context, the role of the reviewing court "is to determine whether the administrator . . . made a correct decision" under the terms of the Plan. *Hoover v. Provident Life and Acc. Ins. Co.*, 290 F.3d 801, 808-09 (6th Cir. 2002) (quoting *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966-67 (6th Cir. 1990)). The administrator's decision is accorded no deference or presumption of correctness. *Id.* at 809. The review is limited to the record before the administrator and the court must determine whether the administrator properly interpreted the Plan and whether the insured was entitled to benefits under the Plan. *Id.*

The claimant bears the burden of proving that she is entitled to benefits. *Javery v. Lucent Techs., Inc. Long Term Disability Plan*, 741 F.3d 686, 701 (6th Cir. 2014). The burden remains exclusively on a claimant even after benefits have been awarded. *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 985-86 (6th Cir. 1991). "Once a claimant is no longer able to prove disability under the Plan's terms, benefits are no longer payable." *Nicolai v. Aetna Life Ins. Co.*, No. 08-CV-14626, 2010 WL 2231892, at *6 (E.D. Mich. June 3, 2010).

**b. Analysis**

Meiman must show that she cannot perform "any reasonable occupation" as defined by the Plan in order to establish her right to long-term disability benefits. The Plan defines reasonable occupation as any gainful activity for which you are, or may reasonably become, fitted by education, training, or experience; and which results in; or can be expected to result in; an income of more than 60% of your adjusted predictability earnings," which in this case is $19.24 per hour. (AR 47, 1200).

Meiman argues that she cannot perform gainful activity because she is functioning below a sedentary level due to her moderate to severe osteoarthritis. Meiman insists that the weakness, pain, and swelling in her knees makes it extremely difficult for her to use the stairs; impossible for her to sit for more than forty-five minutes at a time and for more than five hours in an eight hour

11

day; impossible for her to stand more than two hours; and impossible for her to kneel, crouch, stoop, or crawl. (Doc. 45 at 19-24; Doc. 49 at 5-10). Meiman considers Aetna's 2016 transferable skills analysis untrustworthy because it was based on Dr. Sammarco's report that she could perform medium work, implying that the sedentary jobs the report identified failed to account for her chronic pain and the above-mentioned restrictions. (Doc. 45 at 20, 24-26).

While Meiman is certainly limited by her arthritis and chronic knee pain, her argument that she is functioning below a sedentary level is belied by the record. Meiman's argument overlooks the fact that the occupations identified in Aetna's 2016 transferable skills analysis need only be illustrative of the type of work that she can perform and not examples of specific jobs available to her that meet all of her individual needs. *See Curry v. Eaton Corp.*, 400 F. App'x 51, 70 (6th Cir. 2010).

The argument also fails to discredit the multiple medical opinions stating that she can perform sedentary work with only a handful of minor restrictions. Most of the evidence suggesting that Meiman is disabled comes from the office of her attending physician Dr. Colosimo. Several of those opinions state that Meiman can meet the physical demands of sedentary work, but without explanation declare that she cannot work an eight-hour day and is permanently disabled. These opinions are vague, and there is no

requirement that Aetna fully credit them so long as they are considered equally alongside the other evidence. *Napier v. Harford Life Ins. Co.*, 282 F. Supp.2d 531, 538 (E.D. Ky. 2003) (citing *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 828-30 (2003)).

Aetna equally weighed and fairly considered all the evidence. Meiman's disabling evidence is overshadowed by the most recent medical evidence, which includes notes from her attending physician, Dr. Colosimo, stating she can perform eight hours of sedentary work so long as she can take short breaks to stretch and avoid prolonged periods of standing or walking. The disabling evidence also conflicts with the additional evidence Aetna obtained during the appeals process, including a report from an independent medical evaluator and a response from Dr. Colosimo. Those two pieces of evidence led Aetna to retract its initial medium-work conclusion and instead find that Meiman could perform only sedentary work. Moreover, Aetna's final decision and the recent medical evidence align with the Social Security Administration's finding that Meiman could perform sedentary work with only minor accommodations. *Connelly v. Standard Ins. Co.*, 663 F. App'x 414, 417 (6th Cir. 2016) (finding that the Social Security Administration's denial of benefits weighs in favor of the reasonableness of the insurer's decision).

Meiman must prove that she is disabled. *Likas v. Life Ins. Co. of N. Am.*, 347 F. App'x 162, 167 (6th Cir. 2009). And she cannot overcome the fact that the medical opinions and other evidence, including her own vocational assessment, coalesce on the conclusion that she can perform sedentary work with minor accommodations. The sedentary positions identified in Aetna's 2016 transferable skills analysis are clerical in nature and therefore, from a physical performance standpoint, reasonable examples of the work Meiman can perform.

Meiman next argues that, even if she could perform a sedentary occupation, she is still disabled because there are no occupations available to her based on her training, education, and experience that also pay a reasonable wage as defined by the Plan. Meiman first points out that Aetna had a past practice of identifying jobs using a transferable skills analysis and then continuing to pay benefits because a subsequent labor market survey revealed that there was not a viable labor market for the jobs identified. Indeed, Aetna concluded on at least two occasions that Meiman could perform sedentary or light work and yet continued to pay benefits due to a dearth of available jobs that met the Plan's wage requirements.

Meiman argues that it was unreasonable for Aetna to abandon its past practice of performing a labor market survey and to rely solely on its 2016 transferable skills analysis. This argument

fails because there is no requirement, under the Plan or Sixth Circuit law, that Aetna perform a labor market survey. *See Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 661-63 (6th Cir. 2013); *Douglas v. Gen. Dynamics Long Term Disability Plan*, 43 F. App'x 864, 869 (6th Cir. 2002). The only legal or contractual requirement in this instance is that Aetna have evidence that identifies representative jobs that meet the Plan's adjusted wage requirement. *See Morris v. American Electric Power Long-Term Disability Plan*, 399 F. App'x 978, 984 (6th Cir. 2010) (observing that plan administrator must have rational reason for denying approved benefits). The 2016 transferable skills analysis is such evidence.

Meiman nevertheless contends that the 2016 transferable skills analysis provides neither an accurate nor a reasonable depiction of the labor market and is, therefore, fundamentally flawed. (Doc. 45 at 30-35). Meiman attempts to highlight these flaws by pointing to the vocational assessment she submitted on appeal. That vocational assessment concludes that Meiman would be restricted to entry-level labor jobs such as packing, factory work, material handling, or other sedentary jobs such as working at a call center, as a telemarketer, or as a "routine office clerk helper." (AR 1037). The assessment's entry-level-work conclusion is undermined by Meiman's eleven-year career with Disney in operations where she trained other employees, and her fifteen-year career with Delta

15

where she worked in customer service roles that required her to teach customer service classes. Meiman has also been asked by her town's mayor to serve on a local board. While Meiman has been out of the workforce for a while, her prior experience and current social activities suggest that she possesses skills that qualify her for jobs beyond packing boxes and telemarketing.

Meiman's assessment considers the sedentary positions identified in the 2016 transferable skills analysis inapposite because the jobs were unrelated to her prior work and were based on listings in the out-of-date Dictionary of Occupational Titles. However, the Dictionary of Occupational Titles can be an acceptable source for providing illustrative jobs. *Osborne v. Hartford Life and Accident Ins. Co.*, 465 F.3d 296, 299 (6th Cir. 2006); *Tobin v. Hartford Life & Accident Ins. Co.*, 233 F. Supp. 3d 578, 583 (W.D. Mich. 2017) (finding that plan administrator's use of Dictionary of Occupational Titles was not arbitrary and capricious where its summary of duties was consistent with claimant's summary of her own job performance). Further, the example occupations cited by Aetna need only be illustrative of the type of work Meiman can perform. *Curry*, 400 F. App'x at 70; *Schmidlkofer v. Directory Distrib. Assoc., Inc.*, 107 F. App'x 631, 633 (6th Cir. 2004) (noting that many courts have upheld plan administrator's interpretation of occupation as meaning a general occupation rather than a particular position with a particular employer).

The three jobs Aetna identified all fall under the broader heading of production, planning, and expediting clerks in the Dictionary of Occupational Titles. The general skills required to perform the sixty-one jobs listed under the heading appear to be in accord with Meiman's experience in the airline and amusement park industries. For example, the specific jobs listed in Aetna's 2016 analysis require general planning ability as well as the ability to complete work orders, make personnel assignments, place orders for materials, and complete cost reports. Such skills appear in harmony with Meiman's past work where she was relied upon to make flight reservations, schedule travel, teach employees how to operate amusement park rides, train employees in customer service, and handle baggage and ticketing related issues. Meiman has thus failed to prove that the occupations Aetna identified "require skills that she could not reasonably acquire at [her] age and experience level." *Leppert v. Liberty Life Assur. Co. of Boston*, 661 F. App'x 425, 439 (6th Cir. 2016).

Finally, Meiman takes issue with how Aetna's 2016 transferable skills analysis calculated the wage paid by the three example occupations. (Doc. 45 at 31-33). To calculate the wage paid, Aetna's 2016 analysis took an average of the wages paid for all sixty-one of the jobs listed under the heading of production, planning, and expediting clerks in the Dictionary of Occupational Titles. The average wage for all sixty-one jobs under the heading

was $23.71 per hour, which is $4.47 in excess of the $19.24 required by the terms of the Plan. Meiman points to her vocational assessment as evidence that the jobs available to her only pay between $10 and $12 per hour. But her argument has two flaws. First, because Meiman's assessment only considered entry-level jobs, it ignored her work history suggesting she is capable of more skilled work in customer service and employee training. Second, Meiman's assessment eschews an analysis based on the Department of Labor's economic data and opts for a more anecdotal approach. Its wage-related conclusions are primarily supported by a search of the wages paid by entry-level jobs posted on Career Builder's website.

Meiman also challenges the wage calculation by arguing that she can only perform the occupations listed under the production and planning heading that a have a specific vocational preparation level of three or less. The specific vocational preparation level is an estimate of the time it takes to learn the skills required for a job, e.g., level three and four jobs are considered semi-skilled and require skills that take between one and six months to learn. (AR 1201-02).

Only sixteen of the sixty-one occupations listed under the production and planning heading have a preparation level of three or less. (AR 1055-56). Meiman's argument implies that the average wage data includes the wages for higher skilled jobs that likely

18

pay a higher wage and consequently inflate the average wage to $23.71. While intuitive, Meiman's argument overlooks the fact that Aetna's 2016 transferable skills analysis lists two positions with a higher preparation level (level 4) as good matches and that she has performed semi-skilled work in the past. (AR 1200-02). If the higher vocational preparation level of four is used, as opposed to level three, Meiman would be skilled enough to perform twenty-nine of the sixty-one jobs under the heading, making it unlikely that the average wage for the jobs at Meiman's skill level would fall below the Plan's $19.24 adjusted wage requirement. The average wage for the positions under the relevant heading is, after all, $4.47 over the $19.24 wage required by the Plan.

While Meiman argues that Aetna changed course and denied her benefits for no good reason, Aetna did nothing in an unreasonable or improper manner. Multiple sources, including Meiman's own vocational assessment, agree that she can perform sedentary work with reasonable accommodations. Some recent evidence (e.g., surveillance reports, an independent medical examination, and an independent review) suggests that she can do more. While Aetna paid benefits for several years because it could not identify jobs that met the Plan's adjusted wage requirement, economic conditions and labor markets change, and Aetna has presented evidence of such change with its 2016 transferable skills analysis. And as discussed above, Meiman's vocational assessment fails to undermine the

reliability of that analysis. Consequently, Meiman has failed to prove that she is incapable of performing any reasonable occupation as defined by the Plan.

**III. Conclusion**

For the above reasons, Meiman's Motion for Judgment on the Administrative Record (Doc. 45) is therefore **DENIED** and Aetna's decision to deny benefits **AFFIRMED**. A separate judgment shall enter concurrently herewith.

This 5th day of November, 2019.



**Signed By:**
*William O. Bertelsman*
**United States District Judge**